UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

JANAE SADE ELLIS,

                Plaintiff,                Case No.: 11-12418
                                                          Honorable Marianne O. Battani
                v.                           Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

Plaintiff Janae Ellis brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disabled Child's Insurance Benefits ("DCIB"), (a subset of the Disability Insurance Benefits program), and Supplemental Security Income Benefits ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that Ellis was not disabled under the Act as she retained the capacity to perform a limited range of occupations. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment be **GRANTED**, Ellis's motion be **DENIED** and that, pursuant to sentence four of 42 U.S.C. § 405(g), the

Commissioner's decision be **AFFIRMED**.

**II.    REPORT**

    **A.    Procedural History**

On October 6, 2008, Ellis filed an application for DCIB and SSI, alleging disability as of January 1, 1999. (Tr. 146-55). The claim was denied initially on March 2, 2009. (Tr. 71-78). Thereafter, Ellis filed a timely request for an administrative hearing, which was held on October 8, 2009, before ALJ Daniel Heely. (Tr. 27-64). Ellis, represented by attorney William White, testified, as did vocational expert ("VE") Susan Miranda. (*Id.*). On February 10, 2010, the ALJ found Ellis not disabled. (Tr. 11-26). On April 4, 2011, the Appeals Council denied review. (Tr. 1-6). Ellis filed for judicial review of the final decision on June 3, 2011 [1].

    **B.    Background**

        *1.    Disability Reports*

In a disability report filed on October 7, 2008, Ellis reported that the conditions limiting her ability to work were "learning disabilities" and that these conditions prevented her from working because she had "trouble reading." (Tr. 161-67; 162). She reported no exertional limitations. (Tr. 163). She had never worked. (Tr. 162). Ellis reported that she had seen a doctor for her condition, but listed a primary care doctor and that her only treatment was "exams when needed." (Tr. 164). She did not report taking any medication for her condition. (Tr. 165). Ellis reported graduating high school in 2008, attending special education classes in math, science, history and English. (Tr. 165-66). She reported that she was currently taking two classes at Wayne County Community College. (Tr. 167).

In a disability field report filed that same day, the interviewer documented that Ellis had difficulty with coherency, talking and answering. (Tr. 158-60). The interviewer noted that Ellis

"had trouble answering simple questions. She mumbled when speaking and it was hard to understand her answers to my questions. She was able to read over her appli[c]ations and she did not ask me any questions about the forms." (Tr. 159).

In a function report dated November 11, 2008, Ellis reported that she lives in a house with her family and that her day consists of getting dressed and ready for school and driving to and from school. (Tr. 168-75; 168). Every other day she studies with her tutor and when she comes home she tries to read, helps her dad prepare dinner and then goes to bed. (Tr. 168). She stated that she has always had trouble reading. (Tr. 169) Ellis reported no difficulties in caring for her personal needs, except that she needs reminders to take her medicine. (Tr. 169-70). She reported preparing her own meals daily, (although sometimes she forgets ingredients), cleaning and doing the laundry, walking or driving a car, and shopping occasionally for food or clothes. (Tr. 170-71).

Ellis reported that her hobbies include music, doing nails and braiding hair, which she does twice a month. (Tr. 172). She reported that she likes to go out to the movies and skating once a month and attends church. (*Id.*). She reported that she does not need to be reminded to go places, nor does she need someone to accompany her. (*Id.*). Ellis reported that her conditions affect her memory, concentration, understanding and ability to follow directions. She expounded that she has trouble focusing and with her memory. (Tr. 173). She reported that she can pay attention for about ten minutes at a time and has difficulty with written instructions, but no difficulty with spoken instructions. (*Id.*). Ellis reported that she gets along with authority figures "ok," and responds "ok" to changes in her routine "sometimes." (Tr. 174).

In a third-party function report filed by Ellis's father, Jerry Ellis ("J. Ellis"), on November 11, 2008, J. Ellis reported that he and his daughter spent every day together, taking

trips, going to church or the movies, cooking, "etc." (Tr. 176-83). He described Ellis's activities as going to school, studying, cleaning up, cooking, and visiting with family and friends. (Tr. 176). He reported that Ellis cares for her younger brother when J. Ellis is at work. (Tr. 177). He reported that she has no troubles with personal care, can cook sandwiches and complete dinners, clean, do laundry, and iron, though she sometimes needs reminding and sometimes forgets ingredients when cooking because she cannot read. (Tr. 177-78). J. Ellis reported that his daughter goes out every day, can drive and ride in a car, and shops for clothes and food every other month. (Tr. 179). He reported Ellis enjoys doing nails and braiding hair, going to movies and church. (Tr. 180). He also reported that she needs to be reminded to go places and also needs to be accompanied. (*Id.*). J. Ellis reported that his daughter's condition affects her memory, concentration, understanding and her ability to complete tasks and follow directions. (Tr. 181). Her ability to follow written instructions is "not good [due] to her reading ability," but she has no trouble following spoken instructions. (*Id.*). In a disability appeals report filed on April 21, 2009, Ellis reported no change in her condition, except that she was not able to live on her own and had to move back in with her father. (Tr. 187-192; 190).

        2.    *Plaintiff's Testimony*

At the hearing, Ellis testified that she was twenty years old, had graduated from high school in special education classes and completed two classes at Wayne County Community College, obtaining a C in English and a D in basic math. (Tr. 32-35). She dropped two other classes because they were too hard. She also took two weeks of classes at the Regency Beauty Institute for Cosmetology. (Tr. 34). Ellis testified that she had attended several different high schools because she had not been getting the help she needed. (Tr. 46-47). One of the ways she received assistance was in the form of having people read her tests to her. (Tr. 47). She did not

4

have any special assistance while in community college. ( Tr. 48) She testified that she had never worked. (*Id.*).

Ellis testified that she could read the time and that she could take messages when someone calls, but that sometimes she would forget. (Tr. 35). She testified that she sometimes forgets to finish things she starts, especially when she is interrupted by something else. (Tr. 49). She testified that she had no health issues, except that her doctor recommended she eat healthier. (Tr. 36; 43-44). Ellis testified she lives with her father, who is retired, and brother, who is fourteen. (Tr. 36-37). She spends her day cleaning, mopping floors, washing dishes and doing laundry. (Tr. 37).

She testified that she does not watch much television but that her favorite programs were comedies and BET, although sometimes she cannot follow the plots. (Tr. 37-38; 49-50). She uses a computer occasionally to research schools and look at clothes. (Tr. 38-39). She testified that she has a Facebook profile but that she mostly only communicates with her cousins. (Tr. 38). She also occasionally texts her cousins on her cell phone. (Tr. 39). Ellis testified that she has a driver's license and would drive once a week to visit her grandmother. (Tr. 40). She also shops for food approximately once a month with her father and attends church weekly with him as well. (Tr. 41-42).

   3.  *Plaintiff's Father's Testimony*

J. Ellis testified that Ellis volunteers at church taking care of children, but that she does not work for compensation. (Tr. 51). He testified that Ellis has a tendency to forget things, or get frustrated when she does not understand something. (Tr. 51-52). She had a tutor throughout school, who was a school teacher, and J. Ellis would also actively participate to make sure Ellis was receiving the help she needed to succeed in her classes. (Tr. 52-53). J. Ellis testified that

Ellis sometimes gets confused, and thinks people are saying one thing when they are actually saying something else. (Tr. 53). She has never seen a therapist or received medication for her condition, although at one point she had undergone a number of tests at a hospital. (Tr. 53-55). J. Ellis testified that he did not want his daughter taking medication. (Tr. 54). When asked if his daughter could perform a full-time job, J. Ellis testified, "Yes and no to be honest." (Tr. 58). He explained that Ellis would require someone to help her for a while and explain things to her simply and then be patient with her until she grasped the concept, then after a "long, long period of time," she could likely perform a job. (*Id.*).

    4.  *Documentary Evidence*

      a.  *School Records and Evaluations*

  On February 11, 1997, Ellis was referred to Psychological Services at Detroit Public Schools. (Tr. 213-14). The record of referral is partially illegible but it appears that, at the time, her grades reflected satisfactory marks in language arts, handwriting, spelling and reading, and unsatisfactory marks in math. (*Id.*). The referral states that Ellis's "progress seems to have stopped," and that the "quality and ability in academic areas [is] not on par with other students." (*Id.*). The referral stated that Ellis's weaknesses included daydreaming, a short attention span, and the need for constant reminders. (Tr. 214). She also lacked confidence and displayed "confusion." (*Id.*).

  On February 17, 1997, Ellis was evaluated by one of her teachers at Detroit Public Schools. (Tr. 215). The teacher noted that Ellis had considerable difficulty with being distracted, and lacked continuity of effort. (*Id.*). He noticed slight changes in the quality of her work from day to day, considerable daydreaming, a short attention span and a slight increase in her demands for attention. (*Id.*). He noticed that she had a slight tendency to withdraw quickly

6

from group activities and also sometimes seemed generally unhappy. (*Id.*). The teacher noted slight problems in Ellis's coordination in large muscle activities, a slight lack of a variety of responses (resulting in repeating herself), slight confusion in following directions and slight problems with making comments in the classroom that were unrelated to the subject matter at hand. (*Id.*). Ellis's teacher noted that she had considerable confusion in spelling and writing and was inclined to become confused in number processes, giving illogical responses. (*Id.*). She also exhibited considerable problems with her reading, considerable difficulty with changes to her routine and considerable confusion and apprehensiveness about the correctness of her responses, such that she was indecisive. (*Id.*). He did find that she had considerable knowledge of math concepts appropriate to her current placement. (*Id.*). She also had no problems with hyperactivity, behavior in class or interactions with other students. (*Id.*).

On November 30, 2007, Ellis was evaluated again by one of her teachers at the Detroit Public Schools. The teacher found Ellis eligible for special education programs based on a diagnosis of a "specific learning disability." (Tr. 197). The teacher noted that Ellis had adjusted to expectations in her general education classroom. Her strengths included communication skills, participation in class, and being a hard worker. An assessment of the Brigance Test by the teacher determined that Ellis's word recognition and reading comprehension were at a second-grade level and her reference skills at a fourth-grade level. Her math skills were at a fifth-grade level.

On September 29, 2009, Ellis received a letter from Regency Beauty Institute. (Tr. 242). She was informed that, while she was provided an accommodation for her entrance exam to the program, which resulted in her receiving an 80% score, as compared with a 50% score when she attempted the test without the accommodation, she had received the accommodation in error.

7

(*Id.*). Apparently such accommodations had to be approved prior to their administration and hers had not been approved at the time the accommodated test was administered. (*Id.*). Thus her accommodated score was invalid and her un-accommodated score was deemed insufficient for admittance to the cosmetology program. (*Id.*). As a result, Ellis was being dismissed from the program. (*Id.*).

### b. Psychological Evaluations

On June 7, 2005, Ellis was assessed by psychologist Rody Yezman at the behest of her father. (Tr. 207-12). Dr. Yezman conducted a number of tests on Ellis. (*Id.*) The Weschler Intelligence Scale for Children determined that Ellis's full-scale IQ was 80, in the low average range, with her perceptional reasoning and working memory scores in the borderline range, her verbal comprehension in the low average range and her processing speed in the average range. (Tr. 207). Her particular weaknesses included "areas of abstract, sequential, and word reasoning, fund of general information, and vocabulary. (Tr. 210). The McCarney Attention Deficit Disorders Evaluation Scale found Ellis had a significant score for impulsivity, but no significant score for inattention or hyperactivity. (Tr. 207). However, Dr. Yezman believed Ellis's borderline working memory skills suggested difficulty with attention and concentration. (Tr. 210).

The Woodcock-Johnson Tests of Achievement suggested that Ellis's total achievement was impaired, and significantly below her level of cognitive functioning. (Tr. 208; 210). She was deemed to be impaired in all but 7 of the 33 categories of the test. (*Id.*). Of the seven in which she was not impaired, she was considered borderline in four of them. (*Id.*). Dr. Yezman concluded that there was "sufficient evidence to identify the presence of learning disabilities in all academic areas." (Tr. 211).

### b. *Consultative and Non-Examining Sources*

On January 9, 2009, Ellis was evaluated by Dr. Hugh Bray for the State of Michigan. (Tr. 216-19). Ellis reported no physical health issues, took no medications and had received no mental health treatment. (Tr. 216-17). She reported that she got along well with family, friends, coworkers and employers, but that she did not have many friends. (Tr. 217). She reported that she had just begun working at her church catering tables. (Tr. 216). Ellis reported that she could perform her own self-care, as well as do laundry and housework, cook simple meals, shop and cash checks. (Tr. 217). She reported attending church, driving, reading, watching television, visiting, socializing and running errands. (*Id.*).

Upon examination, Dr. Bray noted that Ellis's contact with reality was intact and her self-esteem was adequate. (*Id.*). He found that she displayed age-appropriate autonomy and motivation. (*Id.*). He found her stream of mental activity to be "simple, concrete and vague." (*Id.*). Her speech was adequate and her content of communication age-appropriate. (*Id.*). Ellis was able to repeat four numbers forward, two backward, and remember one of three objects after three minutes. (Tr. 218). She was able to name one past president, the current president, the governor of Michigan, five large cities, and one famous person, but was not able to recall any current events. (*Id.*). She could not count backwards in sevens from 100, could not spell "world" backwards and could perform only two of four simple calculations. (*Id.*). She was able to correctly interpret one of two proverbs and make appropriate comparisons between a tree and a bush. She also appropriately responded to three judgment-related questions. (*Id.*). Dr. Bray noted that Ellis gave up easily on tasks that she felt she could not do, and was unable to provide any written information on the intake sheet at the office. (*Id.*). He diagnosed her with a learning disorder, not-otherwise-specified, borderline intellectual functioning based on school records and

mild educational and motivational issues. (*Id.*). He issued her a Global Assessment of Functioning ("GAF") score of 50[1] and a prognosis of fair. (*Id.*). He concluded that Ellis's "psychological issues will not significantly interfere with [her] ability to do work related activities doing repetitive tasks." (Tr. 219).

On February 18, 2009, Dr. Ashok Kaul evaluated Ellis's records and assessed her mental capacity on a psychiatric review technique form. (Tr. 224-37). He checked the boxes for organic mental disorder and mental retardation, specifically diagnosing Ellis with a learning disability not-otherwise-specified and borderline intellectual functioning. (Tr. 224-25; 228). He found that she had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace ("CPP"), and no episodes of decompensation of extended duration. (Tr. 234). Dr. Kaul also assessed Ellis's mental residual functional capacity ("RFC"). (Tr. 220-23). He found that she was moderately limited in her ability to understand, remember and carry out detailed instructions, in her ability to maintain attention and concentration for extended periods of time, and her ability to respond appropriately to changes in the work setting. (Tr. 220-21). He concluded, however, that Ellis was "[a]ble to understand, remember and carry out simple instructions," and that she was "capable of simple repetitive tasks on a sustained basis." (Tr. 222).

    4.    *Vocational Expert's Testimony*

The ALJ first asked the VE to consider a hypothetical claimant who was of Ellis's age, educational background, work history (in this case, none), and who could only "communicate in

---

[1] A GAF score of 41-50 signifies "serious symptoms . . . or any serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job)." *The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)* at 34 (2000).

simple very basic English, reading, writing, but nothing complex, technical, or scientific." (Tr. 59-60). He then asked the VE if jobs existed for such a claimant if the claimant had no exertional limitations but "would not have sufficient concentration ability persistence or pace abilities to handle even simple routine tasks types of jobs." (Tr. 60). The VE responded that no jobs existed for someone with those limitations. (*Id.*). The ALJ then modified the hypothetical to consider the same hypothetical claimant's basic characteristics, as well as no exertional limitations, but who "could work at jobs involving simple, routine tasks, but no high volume production line types of jobs with mandatory quotas." (*Id.*). The VE responded that there were such jobs, including (in the medium exertion level category) approximately 13,000 general laborer jobs, 3,600 vehicle cleaner jobs and 1,800 cafeteria attendant jobs. (Tr. 60-61). The quantities of the occupations that the VE identified were all eroded by between 50% and 60% to account for the limitation in production quota. (*Id.*).

The VE was then asked by counsel whether or not those same jobs would exist if the hypothetical claimant also was moderately limited in her ability to respond appropriately to changes in the work setting. (Tr. 61). The VE interpreted this limitation as "behaving inappropriately or that interferes with your ability to function and perform at the minimum expectations of the employer," and testified that such a limitation would preclude the claimant's ability to obtain gainful employment. (Tr. 62).

  **C.**  **Framework for Disability Determinations**

Under the Act, to qualify for the receipt of DCIB, the claimant must not have reached the age of 22 by the alleged onset date, and also be unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

11

than 12 months." 20 C.F.R. § 404.1505(a).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Ellis not disabled. (Tr. 14-23). At Step One, he determined that she had not engaged in substantial gainful activity since January 1, 1999, her alleged onset date, and had not reached age 22 by that date. (Tr. 16). At

Step Two, he found severe the following impairments: organic mental disorder and mental retardation. (*Id.*). At Step Three he determined that Ellis did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 16-17)The ALJ then assessed Ellis's RFC, finding her capable of performing

> a full range of work at all exertional levels but with the following nonexertional limitations: She can communicate in simple, everyday-type of English, with the ability to read simple materials, but nothing complex, technical or scientific . . . She can work at jobs involving simple, routine tasks, but no high volume production-type jobs with quotas.

(Tr. 18). At Step Four he determined that Ellis had no past relevant work to which to return, and at Step Five concluded that, based on her RFC assessment and VE testimony, there was a significant number of jobs in the state economy that she could perform. (Tr. 21). Thus, Ellis was not disabled. (Tr. 22).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.  Analysis**

Ellis argues that the ALJ's RFC assessment, and thus his conclusion regarding disability,

14

was not supported by substantial evidence in the record.[2] As discussed above, the substantial evidence standard is not a high one – it is more than a scintilla of evidence but less than a preponderance. Furthermore, it is not the province of this court to reverse an ALJ's finding simply because the evidence could have pointed to a different conclusion. Ultimately, the court must determine only whether the conclusion drawn by the ALJ is supported by substantial evidence in the record.

In support of her argument, Ellis cites her own and her father's testimony about her difficulties with concentration, understanding and following directions. She also cites the psychological testing done when she was in school, which found her to be impulsive, impaired in oral language, expression and comprehension, listening and reading comprehension, math and writing skills and understanding directions. She points to the fact that her reading skills were at a second-grade level and her vocabulary at a fourth-grade level.

Ellis's argument is not persuasive, as the ALJ explicitly considered all of these pieces of evidence when forming his RFC assessment, but found them to be either over-stated or outweighed by other evidence. (Tr. 18-21). For instance, the ALJ also considered her full IQ score, which was in the low average range, her scores of normal in attention and concentration, and her activities of daily living, which included independently caring for herself, going to school, housekeeping, cooking, attending movies and church, visiting with family members, volunteering at her church, driving a car, caring for her brother in her father's absence, listening to music, researching schools and looking for clothes on the internet and shopping. (*Id.*). He noted that she completed two regular community college classes, and had started a cosmetology program with assistance. (*Id.*). Finally, he noted that Ellis had not received any treatment for

---

[2] She does not argue that the ALJ erred in finding that her conditions did not meet or medically equal a listed disability. Thus the court will not address that part of the ALJ's analysis.

her conditions such as therapy or medication. (*Id.*). The ALJ also stated that he had taken her low reading ability into account in the formulation of his RFC assessment. (Tr. 21).

Ellis also points to the fact that the consulting examiner, Dr. Bray, assessed Ellis with a GAF score of 50 and that, "State Agency medical examiners are highly qualified physicians and psychologists who are experts in the evaluation of medical issues in disability claims under the Social Security Act." (Plf. Brf. at 9). However, as the ALJ noted, Dr. Bray also stated that he did not believe that Ellis's "psychological issues would significantly interfere with her ability to do work related activities doing repetitive tasks." (Tr. 20; 219). Therefore, although Dr. Bray assessed Ellis with a GAF score normally associated with "serious symptoms or serious impairment in one of the following: social, occupational, or school functioning," (Tr. 20), he himself did not believe her condition was so serious as to preclude her from doing simple repetitive work on a sustained basis. The ALJ's RFC assessment, which included simple, routine tasks with no quotas, is consistent Dr. Bray's conclusion.

Finally, Ellis argues that the other consulting examiner's finding, that she had a moderate limitation in her ability to adapt to workplace changes, should have been included in her RFC assessment, thus precluding the jobs the VE found available under the hypotheticals posed by the ALJ. However, that same consulting physician also concluded that Ellis was "[a]ble to understand, remember and carry out simple instructions," and that she was "capable of simple repetitive tasks on a sustained basis." (Tr. 222). Thus, the consulting physician did not find that this moderate limitation in Ellis's ability to adapt to workplace change precluded her from engaging in the types of occupations the VE identified in her testimony. Based on the above analysis, the court finds that the ALJ's RFC assessment is supported by substantial evidence in the record and his decision should not be disturbed.

### III. CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Ellis's Motion for Summary Judgment **[11]** be **DENIED**, the Commissioner's Motion **[12]** be **GRANTED** and this case be **AFFIRMED**.

Dated: July 2, 2012  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
  United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 2, 2012.

  s/Felicia M. Moses
  FELICIA M. MOSES
  Case Manager